## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

---------------------------------------------------------- /
                                        /

| | |
|---|---|
| **JENNY PHENIX,** | |
| Plaintiff, | CASE NO. : _____ |
| v. | |
| **VILLA VIE RESIDENCES INCORPORATED** | **In Admiralty** |
| # 700 -3422 Old Capital Trail PMB 1461 Wilmington, DE 19808, | |
| **VILLA VIE RESIDENCES CORPORATION** 1413 SW 156th Way Pembroke Pines, FL 33027, | |
| & | |
| **VV ODYSSEY LLC** Trust Company Complex Ajeltake Road, Ajeltake Majuro MH 96960 Marshall Islands, | |
| Defendants. | |

## VERIFIED COMPLAINT

Plaintiff, **JENNY PHENIX**, by and through her undersigned counsel, hereby sues the Defendants, **VILLA VIE RESIDENCES INCORPORATION, VILLA VIE RESIDENCES CORPORATION & VV ODYSSEY LLC** collectively referred to herein as **"VILLA VIE GROUP",** and alleges as follows:

## PARTIES

1.      Plaintiff, **JENNY PHENIX**, was and is a resident of and domiciled in the state of

Florida.

2.      Upon information and belief, at all times material, Defendant, **VILLA VIE RESIDENCES INCORPORATION ("VVRI"),** was a company incorporated in the State of Delaware with a place of business and agent for service of process identified above operating a residential cruise ship business worldwide using the *CRUISE SHIP ODYSSEY* and acts as an agent for VVRC, VVO and VVI, for all purposes.

3.      Upon information and belief, at all times material, Defendant, **VILLA VIE RESIDENCES CORPORATION ("VVRC"),** was a company incorporated in the State of Florida and acts as an agent for VVRI and VVI for all purposes with a principal place of business in Pembroke Pines, Florida.

4.      Upon information and belief, at all times material, Defendant, **VV ODYSSEY LLC ("VVO"),** was and is a citizen of the foreign nation of the Marshall Islands, is incorporated in the Marshal Islands and maintains its principal place of business in the Marshal Islands as the owner of the *CRUISE SHIP ODYSSEY* operated by VVRI and VVRC.

5.      **VVRI, VVRC & VVO** market and hold themselves out to the public as the **VILLA VIE GROUP** for purposes of selling residential cruise ship packages on the *CRUISE SHIP ODYSSEY*.

6.      At all times material, the **VILLA VIE GROUP** have maintained a substantial course of trade in or affecting commerce in the United States and the State of Delaware.

7.      The contract issued by the **VILLA VIE GROUP** in connection with this matter specifically provided:

10. It is agreed by and between Voyager and carrier that all claims, disputes, and matters whatsoever arising under, arising out of, or relating to this circumnavigation contract shall be litigated in and before a court of competent jurisdiction located in Wilmington Delaware, U.S.A. This circumnavigation contract provides for the exclusive resolution of disputes through individual legal action on the voyager's own behalf instead of through any class action. Even if the applicable law provides otherwise, Voyager agrees that any lawsuit against the carrier whatsoever shall be litigated by Voyager individually and not as a member of any class or as part of a class action, and Voyager expressly agrees to waive any law entitling Voyager to participate in a class action.

## JURISDICTION AND VENUE

8.    The Court has subject matter jurisdiction over this matter pursuant to 28 USC §1333(1) (admiralty) and the contractual language contained in the residential cruise ship rental agreement or cruise ticket ("Agreement"). The residential passage contract is a maritime contract governed by the general maritime law.  The incidents set forth herein have a potentially disruptive impact on maritime commerce.  The activity set forth herein shows a substantial relationship to a traditional maritime activity. It is a breach of a maritime contract for a cruise operator to accept passenger funds and baggage to take a passenger on a trip and then cancel the trip. Admiralty jurisdiction also exists for common torts committed against cruise ship passengers even when they are not onboard the cruise ship.

9.    The Court has subject matter jurisdiction over this matter pursuant to 28 USC §1367(a) (supplemental) over all other claims that are so related to claims in the action within such original jurisdiction that they form part of the same case or controversy under Article III of the United States Constitution.

10.    Venue in the United States District Court for the District of Delaware is appropriate pursuant to the forum selection clause contained in the residential cruise ship package agreement or cruise ticket and contract terms between Plaintiff and Defendants ("Agreement").

11.    At all times material, Defendants, **VILLA VIE GROUP,** personally or through their agents:

A.    Operated, conducted, engaged and/or carried on a worldwide business

venture advertised throughout the United States, including the State of Delaware;

B. Were engaged in substantial business activity in the State of Delaware marketing and selling their worldwide business venture;

C. Owned and operated a vessel and provided a vessel for cruises in furtherance of their worldwide business venture;

D. Regularly contact consumers by telephone, electronic mail, US. Mail and other instrumentalities of interstate commerce directed at consumers in the United States including the State of Delaware;

E. Transacted business in the state of Delaware which submits Defendants to the jurisdiction and venue of the Court;

F. Specifically subjected themselves to the jurisdiction by stipulation in their Agreements;

G. Further, Defendants are subject to the jurisdiction of the Court pursuant to 28 U.S.C. § 1333.

12. All conditions precedent to the institution of this action have been satisfied, or otherwise excused, including all terms required by the terms and conditions of Defendants' Agreement.

## **GENERAL ALLEGATIONS**

13. At all times material hereto, the causes of action asserted in the Complaint arise under the general maritime law of the United States.

14. At all times material hereto, VILLA VIE GROUP owned, operated, managed, maintained and/or controlled the subject vessel, the *CRUISE SHIP ODYSSEY.*

15. At all times material, the VILLA VIE GROUP operated the *CRUISE SHIP ODYSSEY* in navigable waters.

16. Defendant VILLA VIE GROUP, as a common carrier, was engaged in the business of providing to the public, and to the Plaintiff in particular, for compensation, residential cruise services aboard its vessel, the *CRUISE SHIP ODYSSEY.*

17.     Plaintiff entered into a written business dealings with Defendants on December 5, 2023 (segments 1-17) [Exhibit A], December 27, 2023 (remove segments 1-2) [Exhibit B] and April 14, 2024 (segments 1-2) [Exhibit C] ("Agreement").

18.     As set forth in the Agreement, Plaintiff rented for residential occupancy a Villa on board Defendants' vessel with a projected departure date of May 15, 2024.

19.     Plaintiff had a reasonable expectation of cooperation and mutual benefit with Defendants that went beyond the letter of the Agreement. Plaintiff expected the Defendants to conduct themselves in ways that adhere to the spirit of their deal.

20.     After signing the Agreement, VILLA VIE GROUP purported to change the terms and conditions of the Agreement including the online terms to add nondisclosure terms and limitations or exclusions of any liability without Plaintiff's agreement or consent.

21.     No information provided by VILLA VIE GROUP to Plaintiff, except pricing and itinerary, had any quality of confidence such that it would warrant any form of protection from disclosure.

22.     No information provided by VILLA VIE GROUP to Plaintiff, except pricing and itinerary not already disclosed to the public, were imparted in circumstances importing an obligation of confidence.

23.     No information provided by VILLA VIE GROUP to Plaintiff, was disseminated to the detriment of VILLA VIE GROUP.

24.     Plaintiff was not provided consideration for any purported changes in terms and conditions by VILLA VIE GROUP.

25.     Provisions in VILLA VIE GROUP's online terms that were not in effect when the original Agreement was signed are illusory and are not enforceable.

26.     Plaintiff, along with other passengers who had leased cabins aboard Odyssey, began to arrive for the ship's original departure date in May.

27.     Plaintiff was held over in Belfast for months because of VILLA VIE GROUP's delays.

28.     In anticipation of embarking upon a voyage pursuant to the Agreement, Plaintiff turned various items of baggage over to Defendants.

29.     Pursuant to the Agreement, the Defendants accepted receipt of the Plaintiff's baggage.

30.     Upon information and belief, the Plaintiff's baggage was stowed aboard the *CRUISE SHIP ODYSSEY.*

31.     At all times relevant, Plaintiff's transactions with the Defendants were for Plaintiff's personal and household residential use.

32.     In connection with the transactions, Defendants made material representations that were false as follows:

   A.     VILLA VIE GROUP unilaterally terminated its contract with Plaintiff despite having notified Plaintiff that the ship was ready to sail causing her to travel to the port of embarkation on multiple occasions.

   B.     At the time the contract was agreed, Virtual Windows was a big selling point in the inside cabin that Plaintiff had booked but that feature was removed with no consideration or offer of compensation.

   C.     Plaintiff's cabin size was unilaterally reduced significantly from what was advertised on the original website from 160 sf to 130 sf.

   D.     Advised that Plaintiff's Cabin was going to be completely remodeled but the final

Cabin had minimal changes and looked nothing like the beautiful photo renderings that were on the website.

E.  The original all-inclusive package Plaintiff agreed to included ALL food. With only 3 restaurants on the ship, a $35 cover charge was added to the specialty restaurant, up charge for room service added, and all snacks outside of dining hours were at a fee

F.  The Cabin reserved by Plaintiff was not be available for an undetermined period of time and she was assigned temporary cabins. Construction would be ongoing during the cruise also for an undetermined period of time in several areas.

G.  The restaurant availability was reduced to only one restaurant when boarding was scheduled for mid-July - 2 months AFTER planned embarkation date of May 15.

H.  Medical Center and pharmaceuticals available was never clarified. Many prescriptions would not be available and residents would have to fend for themselves in foreign countries.  Two doctors, one male one female were to be available at all times, that was changed to only one at a time.

I.  Culinary Center where Plaintiff could cook her own food was removed.

J.  Spa menu was released with exorbitantly high prices.

K.  Plaintiff was notified of delays in embarkation quite often with only a few hours' notice causing her to scramble for last minute hotel rooms at last minute high prices, quite often hotels would be booked full so she would have to pack up and move because of the short notice.  This happened well over a dozen times.

L.  Total changes in itinerary numerous times, segment 2 changed 100% eliminating all US and Canadian ports, segment 3 originally to Embark in Miami, changed to

Bahamas.

M.     Losing the Miami Port meant Plaintiff had to cancel Segment 2 to get back to Miami in person to pick up all her belongings and ship everything to the Bahamas, fly herself, costing an excessive amount of unexpected additional expense, after having just spent an unexpected thousands of dollars on her credit cards for the prior 2.5 months living expenses.

N.     All of the Canadian and US ports were unilaterally eliminated from the itinerary without a reason.  Press reports suggested that the ship is not able to pass the US Coast Guard or Canadian safety regulations.  Other reports suggested the ship avoided paying the Federal Maritime Commission Bond for customers embarking in a US port.  As a result she was no longer covered with her insurance policy.

O.     All of the ports in China were removed from the itinerary.   Press reports suggested that China does not allow ships older than 30 years.   Plaintiff previously paid for and went through the difficult process of getting a Chinese visa in preparation.

P.     Ongoing roller coaster ride of the numerous delays usually announced at the last minute.

33.     Plaintiff became a paying residential passenger, expecting to obtain the benefit of the Defendants' representations and lawfully board the *CRUISE SHIP ODYSSEY* when it embarked.

34.     Defendants knew or reasonably should have known at the time the material representations were communicated to Plaintiff that at the time the representations were false.

35. Defendants knew or reasonably should have known at the time the material representations were communicated to Plaintiff that Plaintiff would rely on those representations to her detriment.

36. Defendants knew or reasonably should have known at the time the material representations were communicated to Plaintiff that Plaintiff intended to reside aboard the *CRUISE SHIP ODYSSEY* for an extended period of time resulting in her liquidating businesses and other property and cancelling or terminating various arrangements all in preparation of the extended voyage.

37. After a four-month delay in preparing the ship to embark and changing the itinerary in a way that frustrated Plaintiff's plans to collect belongings at a port stop in Miami, while waiting in Belfast, Plaintiff highlighted her concerns to fellow passengers in private WhatsApp conversations.

38. Plaintiff also privately voiced concerns that refurbishment work could carry on, even after the ship left Belfast, and that she would have to use a temporary cabin as the one she booked was still being used by the crew.

39. Plaintiff did not provide consent to share her private messages with anyone else.

40. Ireland has been part of the European Union since January 1, 1973.

41. Sharing private conversations from messaging apps without consent is illegal under the Ireland's privacy laws and the European Union's General Data Protection Regulation (GDPR) as it amounts to sharing personal data without a lawful basis, breaching the individual's protected right to privacy.

42. The GDPR mandates that all personal data, including private messages, can only be shared with the specific, informed, and unambiguous consent of the individuals involved.

43.     The sharing and then use of Plaintiff's private messages by VILLA VIE GROUP without her consent was unlawful.

44.     Upon notification from Defendants that the ship was again ready to board, Plaintiff traveled back to Belfast arriving on July 18, 2024.

45.     On July 19, 2024, Defendants emailed Plaintiff purporting to unilaterally cancel the Agreement due to cancellation of voyage Segments 1 and 2 and for behavior impacting community morale specifically identified as "continuous complaints and negativity". [Exhibit D]

46.     In a statement released to the press, Mike Petterson, the chief executive of VILLA VIE GROUP, said: "Ms Phenix broke multiple terms and conditions and signed a non-disclosure agreement. The founding residents voted and agreed to uphold her suspension and we plan on respecting that decision.   We have nothing else to comment on the ongoing dispute."

47.     Mr. Petterson's statement was knowingly false.  The Agreement cancelled by Defendants [Exhibit A] did not include any non-disclosure requirements.  Plaintiff had already cancelled the contract addendum for Segments 1 and 2. The Notice of Termination cited no provision of any term or condition applicable to Plaintiff.

48.     The cancellation of Segments 1 and 2, was not a valid reason to cancel Segment 3.

49.     The Plaintiff's behavior was no different than several other similarly situated passengers whose contracts were not terminated.

50.     The purported grounds of cancellation were unlawfully obtained, false, specious and without merit.

51.     Under the clear and unambiguous terms of the Agreement, the Agreement did not

provide for cancellation for the purported grounds alleged.

52.     Defendants conduct purporting to unilaterally cancel the Agreement was dishonest and an abuse of power in the circumstances.

53.     VILLA VIE GROUP drafted the Agreement. Any ambiguous terms of the Agreement must be construed against the drafter.

54.     Upon information and belief, Defendants failed to adequately investigate the purported grounds of cancellation and acted maliciously in the circumstances.

55.     The unilateral cancellation of the Agreement was a breach of its terms. Defendants' refusal to honor contractual obligations set forth in the Agreement is a breach of contract.

56.     Despite the cancellation, Defendants have failed to return the deposit totaling $18,656 belonging to the Plaintiff. Instead, $7962 was refunded and $3464 was awarded as a result of a credit card dispute.  Defendants failed to refund the balance of $7230.

57.     Plaintiff has suffered extreme anxiety and depression as a result of the defendants' conduct. The trauma caused has required her to seek professional treatment.

58.     As a result of Defendants' conduct in breach of the Agreement, Plaintiff has been damaged as follows:

A.      Portion of refund not returned: $7,230.00.

B.      Unreimbursed travel expenses in the amount of $ 31,681.00.

C.      Cost of cover (obtaining substitute services less the cost agreed) in the amount of no less than $100,000.00.

D.      Loss of business reputation or goodwill directly resulting from the breach and misrepresentations in an amount to be determined at trial.

E.      Cost of mitigating damages in an amount to be determined at trial

F.      Fees for legal advice or other professional services directly related to addressing the breach in an amount to be determined at trial.

### COUNT I – BREACH OF CONTRACT

59.     Plaintiff re-alleges, adopts and incorporates by reference the allegations in the paragraphs set forth above as though alleged originally herein.

60.     On December 27, 2023, Plaintiff and Defendants entered into a written agreement.

61.     Pursuant thereto, Plaintiff timely paid all deposits due pursuant to the terms and conditions set forth in the Agreement.

62.     The Defendants agreed to provide Plaintiff with residential cruise ship services in accordance with the Agreement.

63.     Plaintiff delivered funds to Defendants in the sum of $14,391.00.

64.     Defendants failed to provide Plaintiff with residential cruise ship services as set forth in the Agreement.

65.     Defendants unilaterally cancelled the Agreement without good cause.

66.     As Plaintiff waited in Belfast to eventually board the ship for her promised cruise residency, on July 19, 2024 Defendants sent Plaintiff a Notice of Termination of Contract by email.

67.     Defendants based their decision on two reasons – both of which are inconsistent with the terms of the contract.  Neither reason cited any specific term or condition of the written contract.

68.     Defendants then refused to have a meeting with or any discussion with Plaintiff regarding the facts and circumstances relied upon in the unilateral cancellation of the contract.

69.     Subsequently, Defendants proposed possible reinstatement terms and conditions that establish the invalidity of the reasons used to cancel Plaintiff' contract but never followed up with Ms. Phenix.

70.     Upon information and belief, Defendants have actively marketed the Villa booked by Plaintiff for sale at a price that is nearly $100,000.00 higher than the price it was sold to Plaintiff in the Agreement evidencing an intentional intention to deprive the Plaintiff of the benefit of her bargain for Defendants own personal gain.

71.     By reason of the facts and circumstances stated above, Defendants have breached the Agreement.

72.     At all times relevant to this litigation, as set forth in the Agreement, Defendants were in a contractual relationship with Plaintiff and owed a duty to Plaintiff to act in good faith and deal fairly with her.   The Plaintiff timely performed all of her obligations under the Agreement.

73.     Implied in the Agreement is a duty of good faith and fair dealing. This duty is read into the Agreement as a matter of law.

74.     Defendants have breached their duty of good faith and fair dealing by providing assurances to Plaintiff that she would embark on the voyage, notifying Plaintiff that the ship was ready to board, causing Plaintiff to travel to Belfast, Ireland, causing Plaintiff to turn her baggage over to Defendants, and later refusing to honor those assurances and prohibiting her from boarding for discriminatory reasons.

75.     Defendants have breached their duty of good faith and fair dealing by unreasonably withholding passage aboard without justification in a discriminatory fashion.   The unilateral termination of the Agreement with Plaintiff unfairly prevented the Plaintiff from reaping the full

benefits and rights due under the Agreement and marketing of her unit for substantially more than what she had agreed to pay evidences an improper method of gaining financial advantage.

76.     Defendants have breached their duty of good faith and fair dealing by treating Plaintiff in a manner that is objectively deceitful, dishonest, and unreasonable.

77.     Plaintiff suffered substantial additional travel, boarding and replacement or cover costs as a result of the Defendants' breach of the duty of good faith and fair dealing.

78.     Defendants breached that duty on more than one occasion by wrongfully converting, taking, utilizing or managing property and financial interests of the Plaintiff.

79.     Such acts and omissions leading to the Defendants' breach of their duty to deal in good faith and fairly with Plaintiff were the actual and proximate cause of harm to Plaintiff.

80.     Defendants'' conduct was outrageous, with their acts being done with malice or bad motives or reckless indifference to the interests of Plaintiff.

81.     Damages for disappointment and distress resulting from breach of a residential crise agreement under the maritime law are not capable of precise calculation and must be assessed according to the subjective disappointment and distress the Plaintiff has suffered in the circumstances.

82.     By reason of the facts and circumstances stated above, Plaintiff has suffered distress, disappointment, pain and suffering, vexation and discomfort consequent upon physical inconvenience and thus has been damaged by Defendants in the sum of no less than $300,000.00.

## COUNT II – PROMISSORY ESTOPPEL

83.     Plaintiff re-alleges, adopts and incorporates by reference the allegations in the paragraphs set forth above as though alleged originally herein.

84.     In the alternative to Count I, Defendants are liable to Plaintiff for promissory

estoppel.

85.     Defendants sufficiently and unambiguously promised to permit Plaintiff to lawfully

board and embark on the *CRUISE SHIP ODYSSEY.*

86.     Plaintiff's reliance on these promises was foreseeable by Defendants because

Defendants are in the business of providing to the public, and to the Plaintiff in particular, for

compensation, residential cruise services aboard its vessel, the *CRUISE SHIP ODYSSEY* and

Defendants understand the reason and purpose for providing such services.

87.     As a result of Defendants' promises to provide residential cruise services aboard its

vessel and subsequent failure to fulfill their obligations, Plaintiff has been damaged in the amount

of no less than $300,000.00.

## COUNT III – CONVERSION

88.     Plaintiff re-alleges, adopts and incorporates by reference the allegations in the

paragraphs set forth above as though alleged originally herein.

89.     Defendants are liable to Plaintiff for conversion of the funds that were paid to

Defendants for which nothing in return was received despite demand.

90.     Plaintiff has a possessory right or interest in the cash value of the funds paid to

Defendants over which Defendants have exercised dominion or interference in derogation of

Plaintiff's rights.

91.     Plaintiff paid tangible cash to Defendants in the amount of $14,391.00 to obtain

the right to board and embark upon the residential cruise as a Voyager. However, Plaintiff never

obtained such right or benefit because Defendants cancelled the Agreement without refund of

any deposit despite the embarkation of the vessel with Plaintiff's baggage but without her.

92.     Defendants acts of conversion were committed with malice and with reckless and

willful disregard of Plaintiff's rights.

93.     As a result of Defendant's acts of conversion, Plaintiff has been damaged in the amount of no less than $14,391.00.

## COUNT IV – UNJUST ENRICHMENT

94.     Plaintiff re-alleges, adopts and incorporates by reference the allegations in the paragraphs set forth above as though alleged originally herein.

95.     In the alternative to Counts I and II, Defendants are liable to Plaintiff for unjust enrichment.

96.     As the result of Plaintiff's payments to Defendants without value provided to Defendants in connection with the expected residential cruise services, Defendants were enriched by an amount of no less than $150,000.00 for which Defendants failed to deliver on the purpose and intent of the Agreement.

97.     Defendants have not and cannot provide Plaintiff with the value and purpose for which Plaintiff paid the funds, and Defendants has refused Plaintiff's request for refund.

98.     As a result, Defendants have been unjustly enriched at the expense of Plaintiff, to the extent of no less than $150,000.00, and it is against equity and good conscience to allow Defendants to retain the benefits bestowed upon it as alleged here.

## COUNT V – CONSUMER FRAUD AND DECEPTIVE PRACTICES

99.     Plaintiff re-alleges, adopts and incorporates by reference the allegations in the paragraphs set forth above as though alleged originally herein.

100.     Defendants' conduct directed toward Plaintiff violated the applicable Consumer

Fraud Act[1] and the Deceptive Trade Practices Act[2].

101.    Consumer fraud occurred when Defendants made misrepresentations during the sale of residential cruise packages to Plaintiff while she and they were located in Florida. The fraud involved the deception set forth above.

102.    Defendants trade practices were deceptive because the businesses made material misrepresentations about the quality or benefits of their goods and services as set forth above.

103.    Defendants are prohibited from making false statements about their own goods or services or the goods and services offered by other businesses.

104.    At all times material hereto, it was the duty of Defendants to provide Plaintiff with truthful information under the circumstances pertinent to the sale of residential cruise packages.

105.    The Defendants' statements were material to Plaintiff in her decision to transact business with Defendants.

106.    Plaintiff relied upon the Defendants' misrepresentations and was injured as a result. Plaintiffs have suffered loss of money or property as a result of Defendant's actions.

107.    Defendants' actions were intended to cause Plaintiffs financial and other injury and constituted "fraud" and "malice" thereby entitling Plaintiff to punitive damages, in addition to actual damages.

### COUNT VI – FRAUD, DECEIT, AND MISREPRESENTATION

108.    Plaintiff re-alleges, adopts and incorporates by reference the allegations in the paragraphs set forth above as though alleged originally herein.

109.    In the alternative to Count V, Defendants engaged in a fraudulent scheme, artifice and device with the purpose of extracting illegal and exorbitant charges from Plaintiff.

---

[1] Florida Deceptive and Unfair Trade Practices Act.
[2] Florida Deceptive and Unfair Trade Practices Act.

Defendants made the forgoing false statements, knowing them to be false or acting recklessly with regard to the falsity, and with the intent that Plaintiffs act on the statements.

110.    These statements were material to Plaintiff in her decision to transact business with Defendants.

111.    Plaintiff relied upon the Defendants' misrepresentations and suffered losses and damages as a result.

112.    Plaintiff has during her entire career enjoyed a good reputation, both generally and in her occupation.

113.    Plaintiff is informed and believes, and based on that information and belief alleges, that at all times mentioned in this complaint, Defendants employed agents and employees, including CEO Mike Petterson and COO Kathy Villalba, in doing the things alleged in this complaint such individuals were acting within the course and scope of such agency and employment.

114.    Defendants communicated false statements about Plaintiff to others including the press.  For example, Defendants communicated the following to the *Mirror*[3]:

> A Willa Vie Residences CEO Petterson told The **Mirror**: "There are so many inaccurate reports about Jenny Phenix when in fact she herself cancelled all while being on a trip in the Canary Islands fully paid for by VVR.

_____

[3] "The Mirror" refers to a British national daily tabloid newspaper.

> "She didn't just complain in the chats but created a very hostile and toxic environment amongst residents. After receiving dozens of complaints and multiple cancellations directly related to the mayhem she created, we decided to suspend her contract entirely. This was subsequently voted on by the residents who overwhelmingly decided to uphold her suspension."

115.    The publication referred to Plaintiff by name throughout, was made concerning Plaintiff, and was so understood by those who read the article.

116.    The entire statement is false as it pertains to Plaintiff.

117.    As a proximate result of the above-described publication, Plaintiff has suffered loss of her reputation, shame, mortification, and injury to her feelings, all to her damage in a total amount to be established by proof at trial.

118.    Defendants knew or should have known the false statements about the Plaintiff would be published.

119.    The false statements about Plaintiff caused actual harm to the Plaintiff's reputation, including damage to her personal and professional life.

120.    Defendant's actions were intended to cause Plaintiff's financial and other injury and constituted "fraud" and "malice", thereby entitling Plaintiff to punitive damages, in addition

to actual damages.

## COUNT VII – INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS

121.    Plaintiff re-alleges, adopts and incorporates by reference the allegations in the paragraphs set forth above as though alleged originally herein.

122.    Defendants intended to inflict emotional distress upon Plaintiff by, without warning, cancelling the Agreement at the very last minute after Plaintiff had travelled to Belfast to board, refusing boarding and stranding Plaintiff in a foreign country to prevent plaintiff from expressing her concerns about the numerous delays and safety issues as set forth herein.

123.    The emotional distress was intentionally inflicted by the defendants by and thorough their officers, agents, crew, owner, or other entity tied to the vessel.

124.    The intent is further evidenced by the Defendants' subsequent threats to sue Plaintiff for breach of nondisclosure terms when Plaintiff did not enter into any such agreement.

125.    Said conduct was intentional and malicious and done for the sole purpose of causing Plaintiff to suffer humiliation, mental anguish and emotional and physical distress.

126.    As a further proximate result of Defendants' actions and the consequences proximately caused by it, as hereinabove alleged, plaintiff suffered severe humiliation, mental anguish, and emotional and physical distress, and has been injured in mind and body as follows: therapy for the following symptoms: insomnia, severe anxiety, severe stress, severe depression, lack of motivation, nausea, headaches, lack of concentration, shock, PTSD, poor memory, and an inability to make decisions.  And further damages in the sum to be determined at trial based on proof.

## COUNT VIII – NEGLIGENT INFLICTION OF EMOTIONAL DISTRESS

127.    Plaintiff re-alleges, adopts and incorporates by reference the allegations in the

paragraphs set forth above as though alleged originally herein.

128.    In the alternative to Count VII, Defendants by act negligently inflicted emotional distress upon Plaintiff as set forth herein.

129.    The emotional distress was inflicted by the ship's captain, crew, owner, or other entity tied to the vessel.

130.    Said conduct was negligent and Defendants knew or should have known that it was done for the purpose of causing Plaintiff to suffer humiliation, mental anguish and emotional and physical distress.

131.    As a further proximate result of Defendants' actions and the consequences proximately caused by it, as hereinabove alleged, plaintiff suffered severe humiliation, mental anguish, and emotional and physical distress, and has been injured in mind and body as follows: therapy for the following symptoms: insomnia, severe anxiety, severe stress, severe depression, lack of motivation, nausea, headaches, lack of concentration, shock, PTSD, poor memory, and an inability to make decisions.  And further damages in the sum to be determined at trial based on proof.

## COUNT IX – INVASON OF PRIVACY

132.    Plaintiff re-alleges, adopts and incorporates by reference the allegations in the paragraphs set forth above as though alleged originally herein.

133.    Plaintiff had a reasonable expectation of privacy in the closed WhatsApp group created by the cruise line passengers awaiting to embark.  She had a legitimate belief that her privacy would be respected.

134.    The defendant intentionally invaded the plaintiff's privacy by not only eliciting private communications from the closed WhatsApp group but then broadcasting the information

in the public and to the press, including disseminating false and misleading information about the circumstances leading up to and then resulting in the canceling of Plaintiff's agreement thereby placing the plaintiff in a false light in the public eye.

135.    Sharing private conversations from messaging apps without consent is illegal under the Ireland's privacy laws and the European Union's General Data Protection Regulation (GDPR) as it amounts to sharing personal data without a lawful basis, breaching the individual's protected right to privacy.   The Defendants' CEO admitted to violating such privacy rights in communications with the Plaintiff:



**Moderator**  🚢 +1

Founder & CEO · 2 days ago

Jenny Phenix I'm sorry Jenny but nothing is ever private on social media. The terms and conditions do extend to the Whatsapp group and everywhere else our residents communicate.

136.    The GDPR mandates that all personal data, including private messages, can only be shared with the specific, informed, and unambiguous consent of the individuals involved.

137.    The sharing and then use of Plaintiff's private messages by VILLA VIE GROUP without her consent was unlawful.

138.    In the totality of the circumstances, the intrusions were highly offensive to a reasonable person.

139. The intrusions involved a private matter of the Plaintiff.

140. The intrusion caused the Plaintiff emotional anguish, anxiety and suffering.

**WHEREFORE**, Plaintiff, **JENNY PHENIX**, requests the following relief against the Defendants, VILLA VIE GROUP:

A. Plaintiff be awarded the sum of $196,072 for her actual damages.

B. The transactions between Plaintiff and Defendants be declared void and Plaintiff be awarded all sums paid to Defendants, including but not limited to principal, interest, and fees for each and every transaction.

C. Pursuant to her common law claims for fraud, deceit, and misrepresentation, Plaintiff be awarded such actual damages as she may prove at trial, plus emotional and punitive damages.

D. Pursuant to applicable Consumer Fraud and Business Deception causes of action, Plaintiff receive triple her damages, legal fees and costs.

E. Plaintiff be awarded pre-judgment and post-judgment interest.

F. Plaintiff be granted trial by jury for any cause for which she is so entitled.

G. Plaintiff recover her costs, as well as attorney fees.

H. Plaintiff be granted any other relief to which she may be entitled. a trial by jury and any such other relief to which the Plaintiff may be justly entitled.

Dated: March 27, 2025

Gellert Seitz Busenkell & Brown LLC
1202 N. Orange Street, Suite 300
Wilmington, DE 19801
Telephone: (302)


BY: /s/ Gary F. Seitz
    Gary Seitz
    DE Bar # 4457